**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

LYNDA MCMANNES,

       Plaintiff,

vs.

UNITED RENTALS, INC.,

       Defendant.

No. C03-3088-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

---

**TABLE OF CONTENTS**

*I.  INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A.  Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B.  Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*II.  LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   *A.  Standards For Summary Judgment* . . . . . . . . . . . . . . . . . . . . 9
   *B.  McMannes's ADEA Claim* . . . . . . . . . . . . . . . . . . . . . . . . . 11
      *1.  The circumstantial evidence paradigm* . . . . . . . . . . . . . . 12
      *2.  Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . . 15
         *a.  United's arguments for summary judgment* . . . . . . 15
         *b.  McMannes's arguments in resistance* . . . . . . . . . . . 17
         *c.  United's reply* . . . . . . . . . . . . . . . . . . . . . . . . . 18
      *3.  Analysis—McMannes's showing of pretext* . . . . . . . . . . . 20

*III.  CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# I. INTRODUCTION

## A. Factual Background

Plaintiff Lynda McMannes ("McMannes") began working for Elmen Rent-All ("Elmen") in 1974. McMannes was hired by Carl Thompson ("Thompson"), who was Manager of Elmen at that time. During her employment at Elmen, McMannes worked at the Party Center and held a variety of positions before ascending to the position of Party Center Manager. At Elmen, McMannes had much discretion in how to handle personal purchases and merchandise, including merchandise "write-offs." In the late nineties, McMannes started contemplating retirement as she mistakenly believed that she could draw some of her benefits out of Elmen's Employee Stock Ownership Plan ("ESOP") in 2001—when she was 55 years old. McMannes expressed her thoughts on this issue to Thompson, and in 1998 they endeavored to hire an individual who could be groomed to someday take over McMannes's position. McMannes interviewed several candidates and approved Carole Serdahl ("Serdahl") as a suitable person to hire. Serdahl began working as a customer service clerk for the Party Center in April 1998. At Elmen, in addition to her wages, McMannes received a quarterly bonus that was based on the percentage of Elmen's growth over the same time period the previous year.

On July 1, 1999, defendant United Rentals, Inc. ("United") purchased Elmen and made it United's Mason City branch store. Following the purchase, United's Mason City branch consisted of the main equipment rental store, and the Party Center—these two entities were located in separate buildings across the street from one another. All Elmen employees that continued to work for United after the purchase received the same base wage as they had at Elmen. Unlike Elmen, United did not offer quarterly bonuses—rather, at the time of the takeover, United suspended the quarterly bonuses and commissions for all employees pending anticipated profit-sharing.

McMannes became a United employee as of July 1, 1999, and retained her Party Center Manager title. As Party Center Manager, McMannes was the highest-ranking United employee whose duties were confined to the Party Center, and she had supervisory authority over Serdahl and part-time employee Jennifer Zwiebohmer ("Zwiebohmer"). McMannes's duties included maintaining the sales inventory, rental inventories, scheduling any assistance she would need from the main rental store, scheduling deliveries, customer service, promotional sales, and maintaining the building and equipment. McMannes was also responsible for supervising, training and evaluating Serdahl and Zwiebohmer. Thompson remained McMannes's Supervisor, but his job title changed to that of Branch Manager. In addition to Thompson, McMannes sometimes reported to Assistant Branch Manager Dan Gatton ("Gatton"). At some point after becoming an United employee, McMannes found out that she could not, in fact, withdraw from Elmen's ESOP when she turned 55 years old—as she had previously thought.

At some point after July 1, 1999, the Party Center closing time was moved up from 5:30 p.m. to 5:00 p.m. to make it easier for the employees in charge of accounting at the main rental store. As McMannes came into work at 10:00 a.m., moving up the closing time resulted in a 2.5 hour reduction in her weekly hours. This change in closing time did not reduce Serdahl's hours as her starting time was 9:00 a.m., nor Zwiebohmer's hours as she was part-time. When McMannes approached Thompson about the reduction in her hours he told her "I'm not trying to shorten your hours, if you need to work after we're closed, just do it, to get your hours." United's Statement of Material Facts to Which There is No Genuine Dispute ("United's Statement of Facts"), Doc. No. 41 at ¶ 41.

Between the spring of 2000 through early November 2000, the Party Center went through a process of reducing its inventory—this process was encouraged as United was charged 2% for all the inventory it maintained. As part of this process, McMannes had

the authority to determine what items of inventory could be written off. Throughout this process, United's Office Manager Becky Dhondt ("Dhondt"), who was officed at the main store and was in charge of United's bookkeeping, perceived irregularities in McMannes's handling of merchandise—specifically, ordering merchandise for her personal use, taking merchandise without paying for it or buying merchandise below cost while requiring others to pay cost plus a certain percentage. Dhondt felt that Thompson's friendship with McMannes would prevent him from objectively handling the situation, so in August or September of 2000 she reported McMannes's conduct via a hotline United had established for fielding complaints of illegal activity. Eventually, Dhondt was put in contact with Todd Ehrlich ("Ehrlich"), United's Vice President of Security, and forwarded him invoices which Dhondt believed substantiated her allegations. Defendant's Appendix ("Deft's App."), Doc. No. 44, at 403.

In August or September 2000, a meeting was held by Thompson with Party Center employees, including McMannes, to discuss the proper procedure for purchasing and/or taking United merchandise. At this meeting, employees were reminded that if they wanted to take United merchandise, they had to pay cost plus 10%. Deft's App. at 83, 392. Thompson asserts that he also discussed the need to generate sales invoices for all transactions, even write-offs; McMannes does not recall such a discussion. Deft's App. at 83-87, 392.

In September or October 2000, Ehrlich contacted United's Midwest Regional Human Resources Manager, Scott Tuma ("Tuma"), to inform him of Dhondt's complaint. Ehrlich directed Tuma to handle the issue with Thompson. Up until receiving the call from Ehrlich, Tuma had never heard of McMannes before. Tuma called Thompson in October 2000 to discuss the complaint. Though Tuma wanted Thompson to investigate the complaint and deal with McMannes individually, he went along with Thompson's

suggestion of disseminating a memorandum reiterating United's policy that no employee could take *any* merchandise without paying for it. Deft's App. at 446-47.

In October 2000, while not on store premises, Thompson approached McMannes's husband about the new job that he had recently obtained with U.S. Cellular. During this conversation Thompson specifically asked the plaintiff's husband whether McMannes would be covered under the health insurance benefits offered by his new employer.

On approximately November 5, 2000, during a reduction of inventory, McMannes determined that two Mylar balloons that had been in inventory for some time should be written off. *See* Deft's App. at 481 (indicating that inventory was done in early November). McMannes made a handwritten notation that the balloons were to be written off, and assumed that Dhondt had entered her notations, as she usually did, and that the balloons were technically written off in the system. One balloon was an Atlanta Falcons balloon still on display, and the other was a Thanksgiving balloon—one of these balloons was faulty and would not retain helium due to a hole. After making a notation that the balloons were to be written off, McMannes placed them in her cracker box. The balloons had a total value of $1.91. Plaintiff's Statement of Material Facts, Doc. No. 48, at ¶25. On November 8, 2000, Zwiebohmer became hungry and reached into McMannes's cracker box for some crackers, at which time she noticed the two deflated Mylar balloon. Zwiebohmer informed Serdahl of the balloons, who in turn notified Dhondt—who came over to the Party Center to see the balloons for herself. Sometime thereafter, Dhondt showed Thompson the balloons—it is unclear from the record *when* Thompson actually became aware of the balloons; Dhondt claims she told him November 9, 2000, while Thompson claims he was informed on November 14, 2000. United's Statement of Facts at ¶ 42 n.4. At the time that Thompson became aware of the balloons, he did not approach McMannes about them.

On November 9, 2000, McMannes received and signed a copy of United's "Junked Sales Procedure," ("JSP") which states, in pertinent part:

> *United will not allow for any employee, up to and including the branch manager, to take possession at less than cost or not cost of merchandise which has been designated for liquidation as dead or junked.* Employees wishing to purchase a given retail item may do so at a 25% discount from retail. Transactions must be entered by a fellow employee. This requirement protects all parties and assures United of the legitimacy of sales within the branch. The policy applies to all of us and is the best way to avoid situations where the honest of good people needlessly comes into question.

Deft's App. at 399 (emphasis added).

On November 21, 2000, McMannes filled the two Mylar balloons with found helium[1] after the Party Center had closed. McMannes then proceeded to take the balloons home—she did not pay for them or generate a sales invoice for them before taking them out of the Party Center. Just as McMannes was getting into her vehicle with the balloons, Serdahl was driving by the Party Center and noticed that McMannes had filled the balloons and was taking them home. The morning of November 22, 2000, Serdahl reported what she had seen to Assistant Manager Bart Walker ("Walker"). Walker, in turn, informed Thompson. Also on November 22, 2000, Thompson called Tuma to report that McMannes had taken the two Mylar balloons without paying for them—this was the first time Tuma had heard about the balloons. Tuma told Thompson to find out what happened,

---

[1]One item the Party Center rented out to customers were tanks filled with helium. Sometimes, when customers returned the tanks there would still be some helium remaining in the tank. As there was not a way, under the inventory system utilized by United, to put this leftover helium back into inventory, it was referred to as found helium. *See* Plf's App. at 22, 66.

and that if McMannes took the balloons, she should be terminated.

On November 25, 2000, after store hours, Thompson and Gatton confronted McMannes about the balloons. McMannes admitted to taking the balloons home on November 21, 2000, and explained the situation from her perspective. According to McMannes, Thompson then asked her whether she was "still on target to retire." Deft's App. at 158. United, Thompson, and Gatton dispute this allegation. *See* Deft's App. at 483. The parties agree that during this conversation, Thompson asked McMannes what she was thinking taking the balloons after recently signing the "Junked Sales Procedure" memorandum, and indicated that he needed to know whether she had a firm commitment to remaining at United. McMannes responded that she needed to know more about United's vesting policies, a question she had previously raised to which she had never gotten an answer, before making a commitment. During this conversation, Thompson also indicated that McMannes needed to find a way to get along with her coworkers—Serdahl and Zwiebohmer. The confrontation ended with McMannes agreeing to call Thompson the next morning.

Two telephone conversations between McMannes and Thompson occurred on November 26, 2000—both of which McMannes secretly tape-recorded. In the first conversation, McMannes focused on the need to split up Serdahl and Zwiebohmer as they were conspiring to get rid of her, and informed Thompson about the fact that Serdahl and Zwiebohmer would make long distance calls to each other from the Party Center, and that they never reimbursed United for those calls. Thompson indicated that he didn't think that he was getting the support from United to "continue the relationship." After the first conversation, Thompson contacted Tuma and indicated that McMannes expressed no contrition for her actions, and Tuma stated that the only possible resolution at this point was to terminate McMannes. At no time prior to November 26, 2000, was Tuma aware

of McMannes's age. Later, during the second tape-recorded conversation between McMannes and Thompson on November 26, 2000, Thompson told McMannes that United had decided to terminate her. At the time of her termination, McMannes was 55 years old. At the time of McMannes's termination, Serdahl, who was then 37 years old, assumed her job responsibilities but was given the title of Event Coordinator. *See* United's Statement of Facts at ¶130.

United never attempted to file any formal charges against McMannes regarding the alleged theft of the two Mylar balloons.

McMannes never filed any complaints using Elmen's or United's internal complaint procedures regarding any allegedly ageist comments made to her, or actions allegedly motivated by an age animus taken against her.

McMannes filed a complaint of discrimination with the Iowa Civil Rights Commission ("ICRC") on February 5, 2001, which was cross-filed with the Equal Employment Opportunity Commission ("EEOC"). A hearing was held, and on January 17, 2003, the Mason City Human Rights Commission found probable cause for age discrimination in employment. The ICRC and the EEOC issued right to sue letters on July 24, 2003, and September 11, 2003, respectively.

## B. Procedural Background

On October 6, 2003, McMannes filed a Complaint and Jury Demand against United alleging a violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and a violation of the Iowa Civil Rights Act ("ICRA"), IOWA CODE CH. 216. (Doc. No. 1). An Amended Complaint and Jury Demand was filed November 28, 2003. (Doc. No. 11). On December 10, 2003, United filed an Answer to Amended Complaint in which it summarily denied the substance of the plaintiff's allegations. (Doc.

No. 12). On March 1, 2005, United filed a Motion for Summary Judgment. (Doc. No. 40). McMannes filed her Resistance to Defendant's Motion for Summary Judgment and Request for Oral Argument on April 1, 2005. (Doc. No. 48). On April 13, 2005, United filed its Reply in Support of Summary Judgment. (Doc. No. 55). United did not request oral arguments on its motion for summary judgment, however, McMannes did so request oral argument in her resistance. Although it has been the court's strong preference over the years to grant oral arguments whenever requested, the court has not found oral arguments necessary to the resolution of the defendant's motion for summary judgment. Moreover, the court's busy schedule, including post-trial motions in one federal death-penalty case and pre-trial motions, jury selection, and the start of trial in another, has not permitted the timely scheduling of oral arguments sufficiently in advance of trial in this matter to permit timely resolution of the motion for summary judgment. Therefore, the court will resolve United's Motion for Summary Judgment on the parties' thorough written submissions. A jury trial in this matter is currently scheduled for June 20, 2005. The matter is now fully submitted and ready for a determination by this court.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

The parties here agree generally on the standards applicable to a motion for summary judgment. Rule 56 of the Federal Rules of Civil Procedure provides that a defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims against that party. FED. R. CIV. P. 56(b). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." FED. R. CIV. P. 56(c). As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377 (same).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997), *cert. denied*, 523 U.S. 1040 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.*, are "material." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994). Finally, this court has repeatedly taken note of the rule in this circuit that, because summary judgment often turns on inferences from the record, summary judgment should seldom or rarely be granted in employment discrimination cases. *See, e.g., Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994) (citing *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir. 1991)).

The court will apply these standards to the motion for summary judgment by the defendant on McMannes's claims.

### B.  McMannes's ADEA Claim

Under the ADEA, it is unlawful for an employer to "fail to hire or to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). In considering an age discrimination claim brought under the ICRA, the court looks to the ADEA and applicable federal law. *See Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 919 n.2 (8th Cir. 2000) ("The ICRA is interpreted to mirror federal law, including the ADEA") (citing *Montgomery v. John Deere & Co.*, 169 F.3d 556, 558 n.3 (8th Cir. 1999)). Thus, the court's analysis of

McMannes's ADEA claim applies equally to her ICRA claim. *See id.* An ADEA claim can arise as a pretext claim, as a mixed motives claim, or as a reduction in force claim. *Spencer v. Stuart Hall Co.*, 173 F.3d 1124, 1127 (8th Cir. 1999). Each of these types of ADEA claims has slightly different elements. *Id.* (citing *Bevan v. Honeywell, Inc.*, 118 F.3d 603, 609 n.1 (8th Cir. 1997). A plaintiff asserting an ADEA claim—or any claim of employment discrimination based on a protected characteristic—must make out a surmisable case "under either the direct evidence framework of *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989), or the indirect evidence, burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir. 1999). In this instance, United argues that the record cannot support a finding of direct evidence of age discrimination. McMannes concedes that under existing law, the record would not support a finding of age discrimination under the direct evidence *Price Waterhouse* paradigm. The parties widely diverge, however, on whether the record generates a genuine issue of material fact as to circumstantial evidence of age discrimination under the *McDonnell Douglas* burden-shifting analysis. Therefore, the court will first set forth the circumstantial evidence paradigm, followed by the arguments of the parties, and finally a resolution of United's Motion for Summary Judgment.

### 1. *The circumstantial evidence paradigm*

Under *McDonnell Douglas* and its progeny, the employment discrimination plaintiff has the initial burden of establishing a *prima facie* case of discrimination by producing evidence that would entitle the plaintiff to prevail unless contradicted and overcome by evidence produced by the defendant. *Tuttle v. Missouri Dept. of Agriculture*, 172 F.3d 1025, 1029 (8th Cir. 1999); *White v. McDonnell Douglas Corp.*, 985 F.2d 434, 435 (8th

Cir. 1993). The importance of the *prima facie* showing is that it creates the inference that the employer terminated the plaintiff for an impermissible reason. *Hardin v. Hussmann Corp.*, 45 F.3d 262, 264 (8th Cir. 1995). However, as was pointed out above, the *prima facie* case criteria differ for each type of employment decision. *Spencer*, 173 F.3d at 1127; *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 944 (8th Cir. 1994). As to the first stage of the *McDonnell Douglas* burden-shifting analysis, the Eighth Circuit Court of Appeals has explained,

> To make such a [*prima facie*] case under the ADEA, the plaintiff must ordinarily show that: (1) he is a member of a protected age group; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he was discharged; and (4) he was replaced by a *younger* worker.

*Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004) (emphasis added); *and compare Erenberg v. Methodist Hosp.*, 357 F.3d 787, 793 (8th Cir. 2004) ("'In order to establish a prima facie case of age discrimination, the Plaintiff must show that she "(1) is a member of the protected class; (2) was qualified for the position from which [s]he was demoted or discharged; and (3) was replaced by another person.'") (quoting *Rothmeier v. Inv. Advisers, Inc.*, 932 F. Supp. 1156, 1159 (D. Minn. 1996), in turn citing *McDonnell Douglas*, 411 U.S. at 802). "Once established, the prima facie case entitles the plaintiff to a rebuttable presumption that intentional discrimination played a role in the adverse employment action." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 776 (8th Cir. 1995); *accord Tuttle*, 172 F.3d at 1029; *Krenik v. County of Le Sueur*, 47 F.3d 953, 958 (8th Cir. 1995); *Kobrin v. University of Minn.*, 34 F.3d 698, 702 (8th Cir. 1994).

If a *prima facie* case is established, the burden then shifts to the employer to rebut the presumption by producing evidence that the employer made the questioned employment decision for a legitimate, non-discriminatory reason. *Tuttle*, 172 F.3d at 1029; *White*, 985

13

F.2d at 435. The employer's explanation of its actions must be "clear and reasonably specific," *Texas Dept. of Community Affairs v.Burdine*, 450 U.S. 248, 258, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), but the employer's burden of production has nonetheless been held to be "exceedingly light." *Batey v. Stone*, 24 F.3d 1330, 1334 (11th Cir. 1994) (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994)). If the employer meets this burden of production, the legal presumption that would justify a judgment as a matter of law based on the plaintiff's *prima facie* case "simply drops out of the picture," and the plaintiff bears the burden of persuading the finder of fact that the proffered reasons are pretextual and that the employment decision was the result of discriminatory intent. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

The Supreme Court has made clear that the ultimate inquiry is whether the employer intentionally discriminated against the plaintiff. *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983); *Tuttle*, 172 F.3d at 1029; *United States v. Johnson*, 28 F.3d 1487, 1494 (8th Cir. 1994), *cert. denied*, 513 U.S. 1098 (1995). However, if the defendant's proffered reasons are rejected, the trier of fact may infer the ultimate fact of intentional discrimination. *St. Mary's*, 509 U.S. at 510. ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.").

## 2. Arguments of the parties

### a. United's arguments for summary judgment

For purposes of its motion for summary judgment, United concedes that McMannes has met her "light, generalized burden" of setting forth a *prima facie* case of age discrimination. United's Memorandum of Law in Support of Summary Judgment ("United's Brief"), Doc. No. 40, at 14. United proffers the following legitimate, nondiscriminatory, reason for terminating McMannes: "[McMannes] stole United's property by taking the two Mylar balloons without paying for them on November 21, 2000, and in doing so violated its policies on Junked Sales Procedures, among others." *Id.* From there, United avers that it is entitled to summary judgment as McMannes cannot raise a genuine issue of material fact that the proffered legitimate, nondiscriminatory reason was pretextual. Specifically, United rebuts every piece of McMannes's proffered evidence of pretext.

First, United asserts to Thompson's comments to McMannes that United needed to cut expenses at the time it purchased Elmen in July 1999 do not in any way undercut the legitimate, nondiscriminatory reason proffered by United, and, in any event, the remarks are both too remote in time to have causal connection to her termination fifteen months later and the substance of the comments does not reflect an age animus against McMannes.

Second, United tackles McMannes's assertion that her pay was cut when United purchased Elmen by virtue of United's suspension of quarterly bonuses. United contends that this allegation in *no way* undercuts its legitimate, nondiscriminatory reason for terminating McMannes, as it happened over a year prior to her termination, it is too remote in time to establish a causal relationship, and there is *no* evidence to suggest that in this regard McMannes was treated any differently than any other employee.

Third, United takes issue with McMannes's complaint that when United took over

she was divested of her previous discretion to purchase items at cost—claiming that this is completely irrelevant to the inquiry and that all of United's policies and procedures (including the JSP) were applied equally to all employees.

Forth, United claims that McMannes's argument that the two Mylar balloons she took were not worth anything is also irrelevant, as even if this were true it does not undercut the fact that she took United property without paying for it in violation of the JSP McMannes signed prior to taking the balloons. United additionally asserts that McMannes cannot rely on the allegedly ageist comments as they are merely 'stray remarks' that do not undermine the legitimate justification for her termination.

United next addresses McMannes's allegations that she was 'set up' by Serdahl and Zwiebohmer and that they, in conjunction with Thompson and Dhondt, engaged in a conspiracy to get rid of her by instituting the JSP knowing she had set aside the written off balloons, and then waited for her to take them home. United argues that contrary to her assertions, McMannes was explicitly warned not to take merchandise without paying for it and was given every opportunity to return the merchandise or to pay for it in accordance with United policy.

Finally, United takes issue with McMannes's allegation that younger employees Serdahl and Zwiebohmer were treated more favorably than she was in that their hours were not reduced by the change in the closing time of the Party Center. United claims that for such an argument to prevail, McMannes must come forth with evidence that a similarly situated employee that violated the JSP was treated differently than McMannes—something which there is no evidence of in the record. In summary, United contends that McMannes cannot establish a genuine issue of material fact that the proffered legitimate, nondiscriminatory reason was pretextual and therefore, it is entitled to summary judgment on McMannes's ADEA claim.

### *b.     McMannes's arguments in resistance*

In resistance, McMannes apparently concedes that United has offered a legitimate, nondiscriminatory reason for her termination, but emphatically avers that the record *does* generate a genuine issue of material fact that this reason was pretext for age discrimination.  McMannes claims that the record demonstrates that the *only* reason for the decision to terminate her for essentially 'taking out United's trash' was Thompson's perception of her as dispensable due to her age.  McMannes claims that even after United took over in July 1999, as Party Center manager she retained the authority to identify which items were to be junked, and that due to the 2% charge on the value of the inventory United retained, Dhondt on at least one occasion expressly said, with regard to disposing junk inventory: "I don't care what you do with it, get it out of here." Plaintiff's Brief in Resistance to Defendant's Motion for Summary Judgment ("Plf's Resistance"), Doc. No. 48, at 8.  McMannes argues that although she was given discretion to dispose of junked inventory, and in fact was *directed* to get rid of junked inventory, when it was discovered that she set aside two already-written-off Mylar balloons, Thompson drafted up the JSP in order to trap her with it when she took the balloons out of the store on November 21, 2000.

McMannes contends that in the first November 26, 2000, conversation with Thompson he revealed that the overriding issue was the social division between herself, Serdahl and Zweibohmer—a conflict that existed solely due to the age difference between them and herself.  Specifically, during discussions, Serdahl and Zweibohmer would imply that she was too old to understand things, and when they disagreed with her position they would say that they could "change that someday." Plf's Resistance at 9.  Additionally, McMannes contends that there was tension caused by the fact that Serdhal was hired in 1998 with the expectation that McMannes would retire in the next couple years, and when

more than two years had lapsed, Serdahl was ready to have her out. Further, when any disagreement between McMannes, Serdahl and Zweibohmer arose, Thompson would always side against McMannes. Also, on a number of occasions, Thompson would comment that Serdahl reminded him of McMannes twenty years ago. Additionally, McMannes contends that United's asserted 'concern' of enforcing its policies is itself pretextual, as when McMannes informed Thompson of the unauthorized long distance calls between Serdahl and Zweibohmer charged to United, there was not even an investigation into her allegations let alone any sort of punishment.

McMannes avers that further evidence of the pretextual nature of the reason for her termination lies in Thompson's conversation with her husband in October 2000 in which Thompson asked him whether McMannes was covered by the health insurance coverage offered by his new job. Also, McMannes points to the fact that when Thompson confronted her about the balloons on November 25, 2000, one of the first things he asked was whether she was "still on target to retire." Plf.'s App. at 11. Finally, McMannes contends that Thompson's age-related comments are particularly telling of pretext in that, despite United's contention to the contrary, he was a decision-maker in her termination. Ultimately, McMannes contends that as the record generates a genuine issue of material fact that United's proffered legitimate, nondiscriminatory reason is pretextual, summary judgment is not appropriate.

### c.    *United's reply*

In reply, United argues that McMannes's contention that Thompson terminated her has no basis in the record, and that the record, in fact, supports United's position that Tuma, an individual who had no knowledge of her age, alone made the decision to terminate McMannes. United contends that any interpretation of Thompson's statements to the Mason City Human Rights Commission to the contrary is not enough to create a

genuine issue of material fact as to the identity of the decision-maker. Further, according to United, uncontroverted record evidence establishes that Tuma fired McMannes without *any* input from Thompson. As such, any comments made by Thompson that could be perceived as carrying an age animus cannot be taken into consideration in determining the issue of pretext. United asserts that the fact that Thompson was *not* the decision-maker, coupled with Tuma's complete lack of knowledge as to McMannes's age and McMannes's admission that she took the two Mylar balloons after signing the JSP, equate to the type of abundant and uncontroverted evidence that no reasonable factfinder could find the proffered reason was pretextual. Second, United attacks McMannes's allegations of a set-up, asserting that the JSP was drafted after the October 2000 conversation between Thompson and Tuma—before anyone knew that McMannes had set aside the balloons. Further, United argues that even if the record showed that the memo was drafted in response to the discovery of the balloons in McMannes's cracker box, this would not render United's reason for terminating McMannes pretextual. Third, United contends that McMannes's attempts to analogize her situation with the allegedly inappropriate long distance phone calls placed between Serdahl and Zweibohmer is misplaced as McMannes has identified no policy prohibiting such calls and the calls were made for business purposes. Finally, United urges the court not to rely on the Mason City Human Rights Commission's findings and conclusions as they were based on McMannes's testimony which Thompson was not allowed to refute, and it did not have access to the full facts as this court does in evaluating the summary judgment record.

### 3. Analysis—McMannes's showing of pretext

As the parties have essentially conceded both that McMannes has met her burden of establishing a *prima facie* case of age discrimination, and that United has proffered a legitimate, nondiscriminatory reason for her discharge, the disposition of the motion for summary judgment hinges on whether McMannes can generate a genuine issue of material fact that United's proffered reason is pretextual. The showing of pretext necessary to survive summary judgment "requires more than merely discrediting [United's] proffered reason for the adverse employment decision. [McMannes] must also prove that the proffered reason was a pretext for age discrimination." *Kohrt v. MidAmerican Energy Co.*, 364 F.3d 894, 898 (8th Cir. 253004) (quoting *Sprenger*, 173 F.3d at 1128); *see Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) (noting that to create a factual issue on pretext "the ultimate question is whether the plaintiff presents evidence of 'conduct or statements by persons involved in [the employer's] decision-making process reflective of a discriminatory attitude sufficient to allow a reasonable jury to infer that that attitude was a motivating factor in [the employer's] decision to fire [the plaintiff].'") (quoting *Feltmann v. Sieban*, 108 F.3d 970, 975 (8th Cir. 1997)).

First, the court turns toward the bulk of McMannes's proffered evidence of pretext, which centers on Thompson—his comments, actions and in some regard his inaction. Specifically, McMannes points to the following allegations:

- Thompson's comments, on 2-5 occasions, that Serdahl reminded him of McMannes 20 years ago. Deft's App. at 68-69.

- Thompson's question to McMannes's husband in October 2000 as to whether McMannes would be covered under the health insurance benefits offered by U.S. Cellular—his new employer. Plf.'s App. at 92.

- Thompson had meetings with Serdahl and Zweibohmer, and possibly

- Dhondt, on McMannes's days off. Deft's App. at 49.

- After United took over, Thompson brushed her off whenever she wanted to talk to him about anything. Deft's App. at 50.

- Thompson did not follow through on his promise to make up for the quarterly bonuses she received at Elmen, but did not receive at United, through an increase in her hourly salary. Deft's App. at 59, 62.

- Thompson never approached her after finding out she had set-aside the balloons, but rather drafted up the JSP and 'laid in wait' until she took the balloons out of the store. Deft's App. at 103, 404.

- When Thompson confronted her about taking the balloons on November 25, 2000, his first question to her was whether she was "still on target to retire." Deft's App. at 158. McMannes was officially terminated the following day.

As discussed above, comments and actions that could speak to age animus can generally support pretext only when they are made by the decision-maker or influence the decision-making process. In this instance, there is a dispute among the parties as to whether Thompson was a decision-maker in regard to McMannes's discharge. United contends that it was Tuma's decision *alone* to terminate McMannes, while McMannes argues that Thompson and Tuma, together, made the decision. In his affidavit, Tuma avers that he "made the decision to terminate McMannes" and that "Thompson's role was limited to giving [Tuma] information and communicating with McMannes." Deft's App. at 448. Thompson, however, was far less clear as to his role in McMannes's termination. In front of the Mason City Civil Rights Commission Thompson testified:

> COMMISSIONER MCCARTHY: On the 26th you telephoned [McMannes]. Did you terminate her or did she resign?
> THOMPSON: I terminated her.

\* \* \*

> COMMISSIONER MCCARTHY: Was the decision to terminate your decision?
>
> THOMPSON: *Myself, along with, at that time, Scott Tuma, who was Human Resources.*

Plf.'s App. at 100-101 (emphasis added). At his deposition, when asked about these statements, Thompson testified:

> A: [The decision to terminate McMannes] was essentially Scott Tuma's, but I had input related to information that I could supply him.
>
> Q: So are you saying it was Scott Tuma's decision, but you had input; is that your answer?
>
> A: In an informational way, I had to give him what the news was.
>
> Q: So the only involvement that you had was providing information to Mr. Tuma; is that what you're saying?
>
> A: Essentially, that's true.
>
> Q: That wasn't your testimony under oath before the Mason City Human Rights Commission, was it?
>
> A: *I was not wanting to completely divorce myself from the situation—*
>
> \* \* \*
>
> A: At that hearing, it was essentially where I was not divorcing myself from any responsibility for input into the overall deliberations.

Deft's App. at 227-28. With regard to the specific language he used in describing who was responsible for the decision to terminate Tuma, Thompson testified: "That's the wording. The meaning is, is that my responsibility as manager of the store, did not remove me from that—some responsibility." Deft's App. at 229. In spite of Tuma's assertion that the decision to terminate McMannes was his alone, Thompson's ambiguous description of his role in the process—when viewed in the light most favorable to

McMannes—creates a genuine issue of material fact as to whether Thompson was, in fact, a decision-maker in her termination. This factual question makes Thompson's alleged ageist comments[2] relevant, and bearing on, whether United's asserted reliance on the JSP in discharging McMannes was pretext for age discrimination. *See Kohrt*, 364 F.3d at 898; *Richards*, 145 F. Supp. 2d at 995-96.

Other fact issues generated by the record lead the court to find a genuine issue of material fact has been raised as to pretext. First, there is a fact question as to when Thompson found out about the fact that McMannes had set aside the balloons. Dhondt recalled that Thompson was informed of the balloons on November 9, 2000, while Thompson's own recollection was that he was not aware of them until days after the JSP was distributed and returned by all Party Center employees. Deft's App. at 394, 404. However, United's Position Statement with regard to McMannes's ICRC Complaint states:

> [Serdahl and Zweibohmer] called Ms. Dhondt on the morning of November 9, 2000, to show her the balloons in the cracker box. Ms. Dhondt asked Mr. Thompson to come over to see them. Mr. Thompson was hesitant to take disciplinary action against Ms. McMannes due to her longevity with the company. *He generated a Junked Sales Procedure Policy that day and requested all employees receive and sign it.* Ms. McMannes received and signed hers on November 9, 2000. (Exhibit H) *He expected the new policy to cause Ms. McMannes to either return the merchandise or pay for it in the proper manner.*

Plf.'s App. at 114 (emphasis added). Although Thompson denied the truth of the italicized

---

[2] Specifically, Thompson's alleged age-related comments are: (1) statements, on 2-5 occasions, that Serdahl reminded him of Thompson twenty years ago; (2) questioning of McMannes's husband as to whether McMannes was covered under his new employer's health insurance benefits in October 2000; and (3) questioning whether McMannes was "still on target to retire" when confronting her about the two balloons on November 25, 2000.

language in his deposition, Plf.'s App. at 48-49, it is the court's obligation on summary judgment to view the facts in the light most favorable to McMannes—which would be in accordance with United's Position Statement.

In spite of the Position Statement, United now points to various aspects in the record that support its current position that the JSP was drafted weeks before Thompson found the balloons. *See* Plf.'s App. at 138-39. Though there is record evidence that could support United's most current theory, the court's obligation at summary judgment is to view the facts in the light most favorable to McMannes, and in that light, the record supports McMannes's contention that Thompson dispersed and had her sign the JSP *after* finding out about the balloons, in order to ensure her termination pursuant to the memo if she took the balloons from the store.[3]  Further, though United Policy and Procedure Bulletin No.

---

[3]Further, there is evidence in the record that employees monitored the balloons waiting to see if McMannes would take them home. Specifically, Zweibohmer testified that once the balloons were found and the JSP signed, Zweibohmer and Serdahl continued to monitor the cracker box to determine if the balloons were still there:

> Q: . . . . Did you ever check, at any time before Lynda was terminated, to see if the balloons were still in the box?
> A: Yes, I'm sure we did.
>
> * * *
>
> Q: . . . . Did you ever talk to Carole, about whether she had checked the cracker box?
> A: I probably did, yes.
> Q: What would the two of you say? What did she say?
> A: I don't remember. I'm sure we just said they were still in there, to that effect.
> Q: Do you think you checked once a day?
> A: Probably.

Plf.'s App. at 140. However, although Zweibohmer, Serdahl and possibly Dhondt were monitoring the cracker box, there is no evidence in the record that this was done at

(continued...)

3J.026, effective November 19, 1999, lists "[t]heft, concealment or misappropriation of Company property" as an example of cause for immediate discharge, Deft's App. at 336, prior to November 25, 2000, *no one ever* approached McMannes about any perceived violation of this policy. The same is true in regard to United Policy and Procedure Bulletin 2A.001, which requires all employees "to prepare paperwork to accurately show the true nature of every transaction." Deft's App. at 341. In fact, McMannes was *never*, during her entire tenure at Elmen and United, specifically issued any kind of warning, verbal or written, or suspended for conduct perceived to violate these United policies. *See* Plf.'s App. at 61. Thompson even testified as to this issue:

> Q: Prior to November 2000, were you aware of any instance where [McMannes] had taken merchandise without properly accounting for it? . . . .
> A: I wasn't aware.

Plf.'s App. at 52-53. If Thompson, McMannes's direct supervisor, was unaware of any such problem, then it only logically follows that McMannes had never been approached about such a problem or warned that her behavior needed to be corrected. In fact, if McMannes's testimony is believed, Dhondt and Thompson told her it was alright for her to take merchandise that was going to be thrown away. *See* Plf.'s App. at 30. Further, McMannes testified that she merely misunderstood the time frame to which the JSP applied—in that it only applied to property written off after the memo was issued, and in her mind the balloons were written off four days prior to the issuance of the memo and

---

[3] (...continued)
Thompson's direction—although it may be possible that the employees inferred that this is what Thompson wanted based on his preparation and disbursement of the JSP after finding the balloons, and his failure to bring to McMannes's attention that he knew that she had set aside the balloons.

were subject to her perception of company policy as she had practiced it without correction prior to November 9, 2000. Deft's App. at 103-111.

Further, when looking at the record in the light most favorable to McMannes, it is arguable that United did not uniformly apply its policies. Regarding long-distance phone calls from the Party Center to Zweibohmer's home in Elma, Iowa, Serdahl testified:

> Q: You see there are several other telephone calls to Elma, Iowa during that same period, August and September of 2000?
> A: Yes.
> Q: Did you make those telephone calls?
> A: Possibly.
> Q: Did you ever have to pay the company for those long-distance telephone calls?
> A: No.
> Q: During those occasions when you called Jennifer in Elma, Iowa, did you talk about things other than work?
> A: No.
> Q: So none of those telephone calls involved conversations that were outside of business conversations; is that correct?
> * * *
> A: *I can't answer that. I don't know what I talked about four years ago, five.*
> Q: Were you ever disciplined for making telephone calls to Jennifer at home while on working hours?
> A: No. . . .

Deft's App. at 476; *see* Plf.'s App. at 124-25 (Party Center telephone bills showing calls to Elma, Iowa). Despite United's contention that there is no policy against making long-distance phone calls during work hours which were not work related, United Policy and Procedure Bulletin 3J.026, the same bulletin which United relies on for its position that theft would result in immediate discharge, lists "[m]isuses of Company telephone" as an example of a cause for disciplinary action up to and including discharge for repeat occurrences. Deft's App. at 338. Therefore, while McMannes was purportedly

discharged, at least in part, under United Policy and Procedure Bulletin 3J.026 allegations of telephone misuse in violation of that same bulletin against her younger successor were never investigated. *See* Plf.'s App. at 54. In the light most favorable to McMannes, this raises questions of whether United's reasons for her discharge were pretextual.

Finally, the court turns to the alleged comments and/or actions by McMannes's coworkers. McMannes asserts that on one occasion, Karl Sorenson ("Sorenson"), an employee at the main rental store, said something along the lines of "here comes the old sea hag" as she approached. Deft's App. at 74. McMannes also alleges that Serdahl and Zweibohmer would often imply that she was too old to understand what they were talking about, and that if she did something they disagreed with she overheard them say they could "change that someday." Plf.'s App. at 27, 32. McMannes also contends that Serdahl and Zweibohmer took efforts to exclude her from social events they organized. Deft's App. at 151-53. However, there is no contention that Serdahl, Zweibohmer or Sorenson had any role in determining that McMannes should be terminated. The Eighth Circuit Court of Appeals has held that "'*some* causal relationship is necessary to demonstrate the significance of non-contemporaneous statements, or statements made by persons other than the relevant decision-maker, to the resolution of the ultimate issue of intentional discrimination.'" *Kohrt*, 364 F.3d at 898 (quoting *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 779 (8th Cir. 1995)); *see Richards v. Farner-Bocken Co.*, 145 F. Supp. 2d 978, 995-96 (N.D. Iowa 2001) (holding that ageist comments by co-workers were merely "'stray remarks' that, while indicating an age-discriminatory animus *on the part of those employees*, under the circumstances of th[e] case, [were] of no probative value as to [the employer's] decision-making process."). In this instance, these comments and/or actions were not contemporaneous with McMannes's discharge, nor is there any indication in the record that Serdahl, Zweibohmer or Sorenson played any role in determining that

McMannes should be terminated—therefore, these remarks are categorized as 'stray remarks,' which, *standing alone,* would not support an inference of pretext. *See Fischer*, 225 F.3d at 922. However, these comments are "surely the kind of fact which would cause a reasonable trier of fact to raise an eyebrow, thus providing additional threads of evidence that are relevant to the jury." *Id.* at 922-23 (quoting *Bevan*, 118 F.3d at 610) (citations and quotations omitted). Therefore, looked at in conjunction with Thompson's alleged age-related comments, the correlation between Thompson finding out that McMannes set aside the two Mylar balloons and the institution of the JSP, and the disparity in application of United policies between McMannes and Serdahl, these comments "give rise to an inference of intentional discrimination."*Id.* at 923.

In summary, when looked at in the light most favorable to McMannes, Thompson's inquiry of McMannes's husband as to McMannes's health benefits under his new job in October 2000, and specifically his question to McMannes as to whether she was "still on target to retire" contemporaneously with her termination, combined with Thompson's distribution of the JSP after being informed of the balloons and never enlightening McMannes as to his knowledge and the remarks by McMannes's coworkers, discredits United's proffered legitimate, nondiscriminatory reason for McMannes's termination and creates a genuine issue of material fact that United's proffered reason was a pretext for age discrimination. Taken as a whole, and keeping in mind the caution with which summary judgment should be approached in employment discrimination cases based on circumstantial evidence, the court finds that the record generates a genuine issue of material fact sufficient to leave to the jury the question of whether McMannes has met her "'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against [her].'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (quoting *Burdine*, 450 U.S. at 253, 101

28

S. Ct. 1089).

### III.  CONCLUSION

For the reasons set forth in detail above, United's Motion for Summary Judgment is **denied**.

**IT IS SO ORDERED.**

**DATED** this 20th day of May, 2005.

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA